UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------X

LISA LESAVOY, as Successor Trustee of the
Trust, under agreement dated 11/9/93 f/b/o
STEPHANIE MENNEN PETIT; as Successor          02 Civ. 10162
Trustee of the Trust under agreement dated
11/9/93 f/b/o CRAIG MENNEN KEEFER,

                              Plaintiff,              OPINION

     -against-

JOHN B. LANE, RUFUS F. LAND, COMART,
INC., RENEE GATTULLO-WILSON, SOLOMON
SMITH BARNEY, INC., KESTREL, LLC and
JOHN DOE #1 TO JOHN DOE #10, the last
ten names being fictitious and unknown
to the Plaintiff, the persons or
parties intended being the owners,
directors officers or other persons or
corporations, if any, having participated
in the matters described in the complaint,
whose identity is as yet unknown to the
Plaintiff,

                              Defendants.

--------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7|10|08

A P P E A R A N C E S:

          Attorney for Plaintiff

          RICHARD S. BONFIGLIO, ESQ.
          238 - 92nd Street
          Brooklyn, NY  11209-5702

          Attorneys for Defendants Citigroup Global
             Markets Inc. and Renee Gattullo-Wilson

          CLEARY GOTTLIEB STEEN & HAMILTON LLP
          One Liberty Plaza
          New York, NY  10006
          By:  Mitchell A. Lowenthal, Esq.
               Jeffrey A. Rosenthal, Esq.
               Jonathan T. Salomon, Esq.

**Sweet, D.J.**

Defendants Citigroup Global Markets Inc. (sued as Solomon Smith Barney or "SSB") and Renee Gattullo-Wilson ("Gattullo-Wilson") (collectively, the "Defendants") have moved under Rule 56, Fed. R. Civ. P. to dismiss the complaint of plaintiff Lisa Lesavoy ("Lesavoy" or the "Plaintiff") and for judgment on their counterclaim for indemnity. Lesavoy has moved under Rule 56, Fed. R. Civ. P. for judgment to dismiss the Defendants' counterclaim for indemnity. On the findings and conclusions set forth below, the Defendants' motion is granted and Lesavoy's motion is denied.

## I. PRIOR PROCEEDINGS

Lesavoy's 101 page Amended Complaint filed on May 22, 2003 alleged eight causes of action against the Defendants, including claims for violations of the civil RICO statute, federal and state securities laws, fraud and constructive fraud. The Plaintiff's first cause of action alleged that the Defendants aided and abetted the managers of the inter vivos trusts established respectively by Stephanie Mennen Petit (the "Petit Trust") and Craig Mennen Keefer (the "Keefer Trust")

1

(collectively, the "Trusts") of which Lesavoy was trustee, in connection with four breaches of fiduciary duty:

(1) the unnecessary interposition of Comart as introducing broker, effectively increasing the cost of executing each trade for the Trusts without conferring any additional benefit;

(2) the placement of commodities futures and options trades without Petit's express written consent for each one;

(3) the transfer of funds between the Trusts; and

(4) the placement and acceptance of trades that exposed the Trusts to a risk of loss greater than their net assets.

See Lesavoy v. Lane, 304 F. Supp. 2d 520, 527 (S.D.N.Y. 2004).

On June 27, 2003, the Defendants moved pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) to dismiss the Amended Complaint. By opinion dated January 22, 2004 and order dated January 30, 2004, the motion was granted. Id.

On June 9, 2005, Lesavoy appealed. On March 2, 2006, the Second Circuit affirmed dismissal of seven of the eight claims. Lesavoy v. Gattullo-Wilson, 170 Fed. Appx. 721 (2d Cir. 2006). Addressing the four breaches of trust in connection with Lesavoy's aiding and abetting claim, the Court of Appeals held that "[w]ith respect to the second, third, and fourth alleged breaches described above, we agree with the district court that

2

Lesavoy has not properly pleaded the elements of an aiding and abetting claim against SSB." 170 Fed. Appx. at 724. The "only disagreement with the district court's otherwise proper disposition of Lesavoy's claims relate[d] to the aiding and abetting claim based upon the first alleged breach, the unnecessary interposition of Comart as introducing broker." Id. Relying on its recent decision in Twombly v. Bell Atl. Corp., 425 F.3d 99, 117-19 (2d Cir. 2005), rev'd, Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007), the Court of Appeals held that Plaintiff's allegations with respect to the unnecessary interposition of Comart as introducing broker "satisfactorily plead the requisite 'knowing participation' under the liberal, notice-pleading approach of Rule 8" and concluded that "the district court erred in dismissing Lesavoy's aiding and abetting claim in count one, but only to the extent of her allegation that the use of Comart as an introducing broker unnecessarily burdened the trusts with increased costs for which they received no benefit." 170 Fed. Appx. at 725.

Discovery schedules were set following the receipt of the Court of Appeals mandate and discovery proceeded. On January 16, 2008, the instant motions were heard and marked fully submitted.

## II. FACTS

The facts have been set forth in the Defendants' Local Rule 56.1 Statement ("Def. Stmt.") and Plaintiff's Assertion of Disputed and Additional Facts in Opposition. ("Pl. Opp. Stmt.") The facts are not in material dispute except as set forth below.

After November 9, 1993, and through approximately February 1, 2001, defendant John B. Lane ("Lane") served as Trustee of two South Carolina inter vivos trusts established respectively by Stephanie Mennen Petit (the "Petit Trust") and Craig Mennen Keefer (the "Keefer Trust") (collectively, the "Trusts"). Lane ceased serving as Trustee of the Petit Trust on January 23, 2001 and as Trustee of the Keefer Trust on February 16, 2001.

Lane hired Rufus Land ("Land") to serve as a financial advisor to the Trusts with respect to commodities trading (Lane and Land are referred to collectively as the "Trusts' Managers").

In or before January 1995, Lane and Land opened commodity trading accounts at Merrill Lynch Futures, Inc. ("Merrill Lynch") for each of the Trusts and used a portion of

4

the Trusts' assets to make commodity trades. No introducing

broker was involved. The Trusts paid Merrill Lynch a commission

of $15 per roundturn commodities trade. Lane paid Merrill Lynch

a commission of $25 per roundturn commodities trade for his

personal trading in commodities.

In January 1997, Lane moved the Trusts' accounts from

Merrill Lynch to SSB. Lesavoy asserts that Lane moved the

accounts because he was asked to do so by Merrill Lynch.

At the time Lane was closing the Trusts' accounts at

Merrill Lynch, he decided to utilize the services of an

introducing broker to assist him with selecting and opening

accounts for the Trusts at a new clearing firm. Land told Lane

that use of Comart, Inc. ("Comart") would offer several

advantages to the Trusts.

Former defendant Comart, an introducing broker

registered and federally regulated by the National Futures

Association and United States Commodity Futures Trading

Commission, was incorporated in New Jersey in the early 1980's.

Richard Kovner ("Kovner") was the owner of Comart from the time

it was formed until his death in 2004. Kovner had an excellent

reputation and nearly twenty years of experience in the commodity trading industry.

When he met with Kovner, Lane indicated that he was interested in a clearing broker that would match the commission rate of $15 per roundturn commodities trade that the Trusts paid Merrill Lynch.

Kovner suggested to Lane that SSB (through Gattullo-Watson) might be one option as a clearing broker for the Trusts' accounts.

Lane chose to use Kovner and Comart as the introducing broker for the Trusts' accounts. According to Lesavoy, the circumstances of the relationship between Land, Kovner and Gattullo-Wilson prior to Comart becoming the introducing broker are material.

Neither Gattullo-Wilson nor anybody at SSB suggested to Lane that he visit Comart.

Comart had entered into an introducing broker relationship with SSB in 1992, which was memorialized in an Introducing Broker Agreement (the "IB Agreement"). Declaration

6

of Jeffrey A. Rosenthal in Support of Citigroup Global Markets Inc.'s and Renee Gattullo-Wilson's Motion for Summary Judgment ("Rosenthal Decl."), Ex. H.

The IB Agreement provided that "[Comart] shall serve as an independent Introducing Broker on behalf of certain introduced customers for whom [SSB] shall carry accounts. [Comart] hereby represents that it is duly organized, capitalized, authorized, empowered and registered to act as an introducing broker and further represents that it shall maintain such qualification in good order as may be required pursuant to the requirements of the CFTC and NFA." Id. at 1.

The IB Agreement provided that "[Comart] shall assist customers with regard to the establishment and maintenance of their accounts," id. at 2, but that "[i]t is understood that generally customers or customers' designated agent, if applicable, shall route account related instructions directly to [SSB]; as may be appropriate on a case by case basis." Id. at 3. According to Lesavoy, the IB Agreement is atypical, Comart provided no "real services," and Lane knew Comart received compensation.

The IB Agreement provided that "[i]ntroduced accounts shall be charged brokerage commissions on transactions at rates as agreed between [SSB] and [Comart]," id. and that "[w]ith respect to the accounts introduced by [Comart], it is agreed that [Comart] will be paid all commission collected in excess of" certain discounted rates offered by SSB to Comart and memorialized in Schedule A to the IB Agreement. Id. According to Lesavoy, Comart received substantial commissions.

The IB Agreement provided that "[Comart] agrees to fully indemnify [SSB] and hold [SSB] harmless from and against any and all losses . . . which [SSB] may incur by reason of . . . (vi) any failure by an introduced customer to promptly pay an amount due [SSB] in such customer's account." Id.

Lane and Gattullo-Wilson first met in Kovner's offices. Prior to visiting Kovner's office, Lane did not know Gattullo-Wilson or any other commodity brokers at SSB. According to Lesavoy, Land had been trading commodities at SSB through Gattullo-Wilson since 1992 or 1993.

Kovner determined the commission rate that was ultimately charged to Comart's customers.

Comart and SSB indicated that they were willing to offer Lane the same overall commission rate of $15 per roundturn commodities trade at SSB that the Trusts had paid at Merrill Lynch, from which Comart's share would be deducted. For options trades, Comart and SSB agreed to charge half that amount – 50% to open an options position, and 50% to close it.

The average commission paid by Comart's customers introduced to SSB during this time period (other than the Trusts) was more than $22 per roundturn commodities trade. The range of such commissions was from $13 to $99.

Of the forty other accounts introduced to SSB by Comart that traded during this time period, only three received a lower commission rate than the initial $15 rate paid by the Trusts' accounts, while 60% paid a higher commission rate. All of the accounts introduced to SSB by Comart for members of Kovner's own family paid commission rates equal to or more than the initial rate offered to the Trusts.

No other trust accounts trading with Gattullo-Wilson at SSB ever received a lower commission rate than the Trusts.

The commission rate paid by Gattullo-Wilson for her personal trading at SSB was $15 per roundturn.

The Trusts never paid any commissions directly to Comart. According to Lesavoy, Lane understood Comart received part of the SSB commission.

The availability of Comart's resources and financial backing made the Trusts' accounts more attractive to SSB.

In January 1997, Comart introduced the Trusts' trading accounts to SSB, with Gattullo-Wilson as the representative servicing the accounts.

Comart assisted Lane with regard to the establishment and maintenance of the Trusts' trading accounts at SSB.

Lane called Comart to ask for SSB's account opening forms and received SSB's account opening forms. Kovner reviewed the Trusts' account opening documents and completed an account opening checklist.

Comart furnished SSB with the customer agreements, risk disclosure statements, and financial questionnaires for the

accounts opened on behalf of the Trusts. The last three digits
of the account numbers, 009, on the SSB new account forms
represented the broker code expressly assigned to Comart's
customers. The new account documentation submitted to SSB also
included instructions that duplicate confirmations should be
sent to Comart, which served as further notice to SSB that
Comart was the introducing broker for the account.

Prior to the accounts for the Trusts being established
at SSB, Lane and Gattullo-Wilson never had any direct
conversation about opening the accounts.

Comart furnished SSB with copies of the Petit and
Keefer Trust Agreements in a package with the new account
documents.

> The Petit Trust Agreement provides that:
>
> No person, bank or trust company,
> corporation, partnership, association or
> firm dealing with the Trustees or holding or
> keeping any assets, whether funds,
> securities or other property, of the trust
> created hereby, shall be required to
> investigate the authority of the Trustees
> for entering into any transaction involving
> assets of any trust created hereby or to see
> to the application of the proceeds of any
> such transaction, or to inquire into the
> validity, expediency, or impropriety
> thereof, or be under any obligation or

11

liability whatsoever, except to the Trustees; and any such person, bank or trust company, corporation, partnership, association or firm shall be fully protected in making disposition of any assets of the trust created hereby in accordance with the directions of the Trustees.

In addition to assisting the Trusts with account opening documentation, Comart was available as a resource for market commentary, analysis and research, learned pertinent information regarding the Trusts and their financial status, reviewed the Trusts' daily account position status reports and trading records, transmitted margin calls, and guaranteed the settlement of the Trusts' trades to SSB. According to Lesavoy, the margin calls came from Gattullo-Wilson.

When he needed it, Lane always had the attention of Kovner, the owner of Comart. Whenever Lane spoke with Kovner, Kovner seemed knowledgeable about the Trusts and their trading activity. On some occasions, Kovner gave Lane general feedback about the Trusts' accounts, which Lane found helpful. For some part of the period of time that the Trusts were trading at SSB, Land and Kovner had discussions regarding trading strategies.

Gattullo-Wilson knew that Kovner was giving attention to the Trusts' accounts and was available as a resource to the Trusts.

Comart received daily activity statements for the Trusts' accounts. Gattullo-Wilson knew that Kovner was receiving the Trusts' daily activity statements.

SSB issued at least two margin calls to the Trusts in late 2000 and communicated the margin calls to Kovner and Lane.

Kovner communicated the margin calls to Lane and Land by telephone and responded to Gattullo-Wilson to discuss the accounts' status and to indicate that he had communicated the margin calls. Land and Kovner took actions to meet the margin calls through a combination of positions, lowering of margin requirements and additional capital. According to Lesavoy, the margin calls came from Gattullo-Wilson.

In 1999 or 2000, several years after Comart introduced the Trusts' accounts and trading commenced, Lane approached Gattullo-Wilson about further lowering the commission rates for the Trusts. In connection with that inquiry, Lane asked Gattullo-Wilson by telephone whether Comart needed to continue

to be listed as introducing broker. Gattullo-Wilson told Lane that because Comart had introduced the Trusts' accounts to SSB, SSB was contractually obligated to recognize Comart as introducing broker for the accounts, but that Lane was free to discuss a lower commission rate with Kovner. Other than this conversation, nobody at SSB ever informed Lane that Comart had to be listed as the referring broker for the Trusts' accounts.

Gattullo-Wilson had follow-up discussions with Lane regarding commissions; Lane indicated that he had talked to Kovner about lower commissions and at Kovner's request, lower commissions rates were charged for particular types of commodities trades. SSB subsequently charged the Trusts a commission of less than $15 for particular types of commodities trades, including sugar, for which the Trusts paid a commission of only $11 per roundturn trade.

After Lesavoy filed her lawsuit against the SSB Defendants, her counsel wrote a letter (the "Bonfiglio Letter") to the Trusts' beneficiaries in which he stated that in drafting the complaint in this lawsuit, Plaintiff "inferred" that Lane's use of Comart as introducing broker was for "less than good fiduciary purposes." Lesavoy reviewed and approved the Bonfiglio Letter before it was sent to the beneficiaries.

14

Lesavoy has also set forth lengthy factual assertions
to the effect that Lane's duties as trustee are defined by
various provisions of the Trusts and Lane's activities with
respect to the Trusts, Pl. Opp. Stmt. ¶¶ 71-154, and describing
actions taken by Merrill Lynch and Lane's transfer of the
Merrill Lynch position to SSB. Id. at 161-180. Further,
according to Lesavoy, Lane needed no introduction to SSB based
on the relationships between Land and SSB employees and
customers, including Gattullo-Wilson, Pl. Opp. Stmt. ¶¶ 181-194,
Gattullo-Wilson was responsible for the SSB/Comart relationship,
id. at ¶¶ 195-205, and Comart provided no services to the
Trusts. Id. at ¶¶ 206-219. Lesavoy has also described expert
testimony with respect to Lane's breach of his fiduciary duty,
the alleged duty of SSB to make inquiry, the lack of services
and consideration provided by Comart and the availability of a
better commission rate than that offered by SSB. Pl. Opp. Stmt.
¶¶ 220-231.


## III. APPLICABLE LEGAL STANDARDS


### A. Summary Judgment

Summary judgment is granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004). The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995). Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Resid. Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

16

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quotation omitted).

Finally, "where the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991); see also Unterberg Harris Private Equity Partners, L.P. v. Xerox Corp., 995 F. Supp. 437, 441 (S.D.N.Y. 1998).

> When a defendant has moved for summary judgment on the ground that the undisputed facts reveal that the plaintiff cannot establish an essential element of the claim, on which element the plaintiff has the burden of proof, and the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to

return a verdict in his or her favor on that
element, summary judgment should be granted.

Burke v. Jacoby, 981 F.2d 1372, 1379 (2d Cir. 1992); Unterberg,
995 F. Supp. at 441.

## B. Aiding and Abetting Breach of Fiduciary Duty

A person may be liable as an aider and abettor for the

tortious conduct of another if the person "knows that the

other's conduct constitutes a breach of duty and gives

substantial assistance or encouragement to the other so to

conduct himself." Restatement (Second) of Torts § 876 (1979).

Under New York law,

> a plaintiff seeking to establish a cause of
> action for aiding and abetting a breach of
> fiduciary duty must show: (1) the existence
> of a violation by the primary (as opposed to
> the aiding and abetting) party; (2)
> 'knowledge' of this violation on the part of
> the aider and abettor; and (3) 'substantial
> assistance' by the aider and abettor in the
> achievement of the primary violation.

Design Strategy, Inc. v. Davis, 469 F.3d 284, 303 (2d Cir. 2006)

(quotation and alterations omitted); See also Lerner v. Fleet

Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006) ("A claim for

aiding and abetting a breach of fiduciary duty requires: (1) a

breach by a fiduciary of obligations to another, (2) that the

defendant knowingly induced or participated in the breach, and

18

(3) that plaintiff suffered damage as a result of the breach."
(quoting Kaufman v. Cohen, 760 N.Y.S.2d 157, 169 (App. Div.
2003)). Thus, consistent with the direction of the Court of
Appeals, to survive the Defendants' motion for summary judgment
Lesavoy must adduce evidence from which a reasonable jury could
find: (1) the Trusts' Managers breached their fiduciary duties
to the Trusts' beneficiaries because using Comart as introducing
broker increased costs to the Trusts without conferring any
benefit; (2) Defendants had actual knowledge that the Trusts'
Managers were breaching their fiduciary duties by engaging
Comart as introducing broker; and (3) Defendants substantially
assisted the Trusts' Managers in breaching their fiduciary
duties by using Comart.

## IV. DISCUSSION

### A. No Breach of Fiduciary Duty by Lane
### in Hiring Comart Has Been Established

Lesavoy alleges that Lane's use of Comart as
introducing broker constituted a breach of fiduciary duty
because it imposed increased costs on the Trusts, for which they
received no benefit. See 170 Fed. Appx. at 725. Lesavoy has
failed to adduce any evidence to support this allegation. In

contrast, Defendants have presented compelling evidence that
Lane's use of Comart did not increase the costs of the Trusts'
trading, and that the Trusts did in fact receive benefits from
the use of Comart.

### *Lane's Use of Comart Did Not Increase the Cost of Trading for the Trusts*

Before trading with SSB, the Trusts' accounts traded
commodity futures and options at Merrill Lynch, where they
received a commission rate of $15 per roundturn (exclusive of
fees). At SSB the Trusts paid the same or less for their
trades, inclusive of the commissions paid to Comart.

There is no evidence that the Trusts would have
received a lower rate from SSB had they not been introduced by
Comart. Gattullo-Wilson has testified that Comart's
introduction enabled the Trusts to get the benefit Comart's
preferred rate at SSB, which otherwise would not have been
available to the Trusts. Rosenthal Decl., Ex. I at 362-363,
380-381, 383.

Lesavoy concedes that the Trusts received the lowest
commission rates Gattullo-Wilson ever offered to any trust

20

accounts at SSB, compare Def. Stmt. ¶30 with Pl. Opp. Stmt. ¶ 30, and that, at most, the Trusts paid SSB the same $15 per round turn rate that they were charged by Merrill Lynch. Compare Def. Stmt. ¶¶ 4, 64 with Pl. Opp. Stmt. ¶¶ 4, 64.

Lesavoy also concedes that the Trusts paid SSB the same or lower rates on all of their commodity futures and options trades as paid by members of Comart president Richard Kovner's family and nearly every other Comart customer (who paid, on the average, $22 per round turn), and Gattullo-Wilson personally. Compare Def. Stmt. ¶¶ 28, 29, 31 with Pl. Opp. Stmt. ¶¶ 28, 29, 31.

Lesavoy argues that the expert affidavit of John Geelan ("Geelan Aff.") supports the proposition that the use of Comart did in fact increase the cost of trading for the Trusts. The Geelan Affidavit states that unidentified brokers have offered slightly lower rates to unidentified customers on certain commodities trades, and concludes that the Trusts could have found other futures commission merchants willing to offer lower rates than $15 per round turn. Id. ¶¶ 89-100. However, the Geelan Affidavit states that there is "no way to establish with certainty, what rates [Lane] could have negotiated with

Salomon Smith Barney had he negotiated with them directly on behalf of the Petit Trust . . . ." Geelan Aff. ¶ 88.

"The court performs the same role [under Daubert] at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); see also Israel v. Spring Indus., Inc., No. 98 Civ. 5106 (ENV)(RML), 2006 WL 3196956, at *2 (E.D.N.Y. Nov. 3, 2006) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" (quoting Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir. 2005)). The Geelan Affidavit fails to explain how the rates charged by the unidentified brokers to unidentified clients are relevant to whether the use of Comart increased the cost of trading for the Trusts. Particularly in light of the fact that the Trusts paid the same or a greater fee for trades at Merrill Lynch, the Geelan Affidavit fails to create an issue of fact.

### The Use of Comart Provided a Benefit for the Trusts

Lesavoy has also failed to put forward evidence that the Trusts received no benefit by using Comart, while Defendants

have established a number of ways in which Comart's participation benefited the Trusts.

Lesavoy argues that "consideration to the respective Trusts . . . was entirely illusory," relying on the Geelan Affidavit. See Pl. Mem. at 16, citing Geelan Aff. ¶¶ 39, 76. The Geelan Affidavit states conclusorily that "the relationship between Comart and Smith Barney resulted in no services or consideration of any meaningful value" to the Trusts. Geelan Aff. ¶¶ 39, 76. It does not explain what "meaningful value" means, nor does it articulate any factual basis for its conclusion.

Lesavoy also asserts that "Lane acknowledged under oath that Comart provided no services of consequence." Pl. Mem. at 16, citing Affidavit of John B. Lane ("Lane Aff.") ¶ 14. The Lane Affidavit states:

> At no time during the period in which the respective Trusts maintained commodities trading accounts with [SSB] did Comart furnish me, my investment advisor, Rufus Land or either of the respective Trusts with any investment advice or trading information, nor did Comart ever accept, relay or otherwise participate in the execution of any trade on behalf of either Trust.

23

Lane Aff. ¶ 14. Lane did not testify that "Comart provided no services of consequence." Because, as discussed below, Defendants have demonstrated that Comart provided other benefits to the Trusts, the Lane Affidavit fails to provide an issue of disputed material fact.

Lane testified that he was concerned that without an introducing broker like Comart, he risked being turned away by a first-tier brokerage firm like SSB. Rosenthal Decl., Ex. C at 62-63, 88-92, 94. Lane believed Comart's participation as an introducing broker gave the Trusts credibility and buying power, as well as Kovner's connections in the industry. Id. at 91. Gattullo-Wilson confirmed that SSB looks more favorably on accounts introduced by an established introducing broker, id., Ex. I at 217-218, and that Comart's introduction in this case, specifically, made the Trusts' accounts more attractive to SSB:

> because Comart was available to provide certain services and information, that eliminated a certain amount of burden on my staff and made the accounts more attractive in that way because there would be less servicing required of us. And also because Richard Kovner, who was a very reputable and experienced professional in the industry, was available to obtain information from the clients and to provide -- provide services and stand in-between the accounts at Smith Barney. . . . And because Comart indemnified Smith Barney on the trades and liability, that also made the accounts more attractive.

24

Id. at 381-382.

Comart reviewed the Trusts' account opening documentation and the Trusts' trading activities, and conveyed and collected margin calls. Comart also guaranteed the Trusts' trades: if the Trusts were unwilling to or unable to meet any margin calls, Comart was required to cover any trading losses. The Trusts also had access to the advice of Kovner, with his nearly twenty years of experience in the industry.

It has therefore been established that Comart's participation as introducing broker did in fact provide a benefit to the Trusts.

## B. Defendants' Knowledge of Any Fiduciary Breach with Respect to Comart Has Not Been Established

Even if Lesavoy could establish that, contrary to the conclusions reached above, the Trusts' Managers breached their fiduciary duties by engaging Comart, she would also have to present sufficient evidence to allow a reasonable jury to conclude that Defendants had actual knowledge of the breach. See Kolbeck v. LIT Am., Inc., 939 F. Supp. 240, 246 (S.D.N.Y. 1996) (New York "has not adopted a constructive knowledge

standard for imposing aiding and abetting liability. Rather, New York courts and federal courts in this district, have required actual knowledge."), aff'd, 152 F.3d 918 (2d Cir. 1998). See also Lesavoy, 304 F. Supp.2d at 526-527.

No evidence has been adduced that Defendants possessed actual knowledge that the use of Comart as introducing broker amounted to breach of fiduciary duty by the Trusts' Managers.

As to Gattullo-Wilson, she testified that she knew that the Trusts received benefits from Comart at the time their accounts were introduced to SSB, both in terms of the discounted commission rate they received and SSB's willingness to accept the Trusts' accounts. Rosenthal Decl. Ex. I, 217-218, 362-363, 380-383. Gattullo-Wilson also testified that the Trusts received these benefits in part because Comart agreed to indemnify SSB for any trading debts unpaid by the Trusts. Id. at 89, 373-374, 381-382. Furthermore, Gattullo-Wilson knew that the Trusts paid SSB (and Comart) a total commission rate on their commodities trades that was at all times the same or less than the rate they had paid at Merrill Lynch, id. at 118-19, 213-16, 362-64, and that Comart learned pertinent information regarding the Trusts and their financial status, assisted the Trusts' Managers with account opening documentation, reviewed

the Trusts' daily account position status reports, assisted with the notification and collection of margin calls, and was available to the Trusts' Managers as a resource for market commentary, analysis and research. Id. at 139-141, 143-45, 192, 256, 282, 362-63, 373-74, 380-82. Lesavoy has adduced no evidence that Gattullo-Wilson was aware of a breach of fiduciary duty by the Trust Managers.

Similarly, Lesavoy has not established that SSB had any actual knowledge that the Trusts' Managers' use of Comart constituted fiduciary breach.

Lesavoy's discussion of this element focused on the dismissed claims—allegations concerning Lane's attempt to continue to trade in commodities, the "inherent improvidence of trading in commodities," and Lane's conflicts. She noted Defendants' alleged review of the Trust Agreements and Merrill Lynch's alleged concerns, which "imposed a duty on the Smith Barney Defendants to make further inquiry into the matters of Lane's authority to trade." Pl. Mem. at 16-20. This does not establish that the SSB Defendants had actual knowledge of any breach with respect to the engagement of Comart. The

particulars stated[1] simply do not bear on the sole surviving
claim.

## C.   There Is No Evidence of Substantial Assistance
by SSB of Any Fiduciary Breach with
Respect to Lane's Use of Comart

"One provides substantial assistance if he
'affirmatively assists, helps conceal, or by virtue of failing
to act when required to do so enables [the breach of fiduciary
duty] to proceed.'"  Kolbeck, 939 F. Supp. at 247, (quoting
Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 284
(2d Cir. 1992)).

Lesavoy argues that Defendants' substantial assistance
consisted of "[e]nabling Lane to continue trading in commodities
. . . precisely the substantial assistance that is required to
sustain the claim."  Pl. Mem. at 21.  However, the "simple

---

[1]   The cumulative weight of the evidence as to the Smith
Barney Defendants' actual knowledge of the true state of
affairs and Lane's actions in breach of his fiduciary
duties in this matter is overwhelming.  It begins with
their admitted knowledge they were dealing with a
fiduciary, extends to their knowledge of the terms and
assets of the respective Trusts, garnered from the
agreements and financial statements; and, continues to
their discernment of the amendment of the Petit Trust but
not the Keefer Trust.  Add to that Lane's having shared the
Merrill concerns with Gattullo-Wilson and the picture is
complete.

Pl. Mem. at 20.

providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker." Greenberg v. Bear, Stearns & Co., 220 F.3d 22, 29 (2d Cir. 2000) (quoting Stander v. Fin. Clearing & Servs. Corp., 730 F. Supp. 1282, 1286 (S.D.N.Y. 1990)); see also Lesavoy, 304 F. Supp.2d at 529.

Lesavoy also argues that the SSB Defendants caused Comart to be interposed as introducing broker. However, the evidence demonstrates that the Trusts' Managers went first to Comart for an introduction to a clearing broker, and at Comart's suggestion elected to introduce the accounts to SSB. Rosenthal Decl., Ex. I at 191-92, 197, 212-13; Ex. L at 35. Neither Gattullo-Wilson nor anybody at SSB suggested to Lane that he consult with Comart. Id., Ex. C at 97-8; Ex. I at 211-13. Prior to visiting Kovner's office, Lane did not know Gattullo-Wilson or any other commodity brokers at SSB, and Lane and Gattullo-Wilson never had any direct conversations about opening the Trusts' accounts at SSB prior to the time the accounts were introduced by Comart. Id., Ex. C at 96; 211-13.

Lesavoy has continued to assert that the SSB Defendants caused the interposition of Comart based on the fact that Gattullo-Wilson and Land, the Trusts' investment advisor,

knew each other previously. However, Lesavoy has presented no
evidence that Land and Gattullo-Wilson discussed any aspect of
the Trusts' business prior to their engagement of Comart or that
Land or Lane ever approached Gattullo-Wilson or SSB before
engaging Comart. Land's mere prior familiarity with Gattullo-
Wilson does not create a triable issue.

Lesavoy also relies on "Lane's sworn statement that 'I
was informed by Renee Gatullo-Wilson that Comart had to be
listed as the referring broker.'" Pl. Mem. at 19 (quoting Lane
Aff. ¶ 14). However, this statement does not provide any
evidence of "substantial assistance," because it refers to
Lane's inquiry, after having done business with SSB for several
years, about SSB's continued duty to list Comart as introducing
broker. Rosenthal Decl., Ex. C at 147. Gattullo-Wilson's
response related to SSB's contractual obligation in light of
Comart's actual introduction of the Trusts' accounts. Id., Ex.
I at 194-95.

## D. The SSB Defendants Are Entitled to Summary Judgment on Their Counterclaim for Indemnification

At the time the Trusts' trading accounts were opened,
Comart furnished SSB with copies of the Petit and Keefer Trust

30

Agreements with the new account documents. Id., Ex. I at 231-32. Article V of the Trust Agreements establishes the Trusts' intent to indemnify third parties, such as Defendants, for liabilities or costs incurred as a result of following the Trustee's directions.

Both Trust Agreements provide that they shall be governed by South Carolina law. Id., Ex. A at 18, Ex. B at 20. South Carolina law recognizes that where a contracting party makes a promise for the benefit of a third person, that third person may maintain an action to enforce the promise. See Touchberry v. City of Florence, 367 S.E.2d 149 (S.C. 1988) (though not a party to contract, individual may nonetheless be a third party beneficiary where he was intended direct beneficiary of the contract).

Article V of the Petit Trust Agreement, titled "Dealings With Third Parties," provides in relevant part that "any . . . person, bank or trust company, corporation, partnership, association or firm shall be fully protected in making disposition of any assets of the trust created hereby in accordance with the directions of the Trustees." Id., Ex. A at 13-14. Article V of the Keefer Trust Agreement contains a substantively identical provision. Id., Ex. B at 15.

Under South Carolina law, where contract language is plain and unambiguous, that language determines the force and effect of the instrument. Blakely v. Rabon, 221 S.E.2d 767, 769 (S.C. 1976); see also Jordan v. Sec. Group, Inc., 428 S.E.2d 705, 707 (S.C. 1993) ("Where the language of contract is plain and capable of legal construction, that language alone determines the instrument's force and effect."). "A contract is ambiguous only when it may fairly and reasonably be understood in more ways than one." Id.

According to Lesavoy, the clause upon which Defendants base their claim excludes actions brought by the trustee. However, the express exclusion of "claims made by the trustee" is in a different sub-clause of Article V than the one relied upon by Defendants. The sub-clause referred to by Lesavoy provides that "[n]o person . . . shall be required to investigate the authority of the Trustee . . . or to inquire into the validity, expediency or propriety thereof, or be under any obligation or liability whatsoever, except to the Trustee." Rosenthal Decl., Ex. A at 13-14, see also id., Ex. B at 15. The next clause, upon which the SSB Defendants rely, has no such exclusion: "any such person . . . shall be fully protected in making disposition of any assets of the trust created hereby in

32

accordance with the directions of the Trustee." Id., Ex. A at
13-14, see also id., Ex. B at 15.

The "fully protected" language does not exclude claims
brought by the trustee. "It is axiomatic that the intent and
purport of a written contract or agreement has to be gathered
from the contents of the entire agreement and not from any
particular clause or provision thereof." Bruce v. Blalock, 127
S.E.2d 439, 442 (S.C. 1962). Here, claims by the trustee are
excluded with regard to the first clause of Article V but not
the second clause. Defendants' construction gives effect to the
language of both clauses. By contending that a third party who
makes a disposition of assets has no protection from actions
brought by the trustee notwithstanding the words "fully
protected," even in the absence of any wrongdoing by the third
party who follows the directions of the trustee, Lesavoy has
proposed a construction that would render meaningless the second
half of Article V. Cf. First Nat'l Bank of S.C. v. U.S. Fid. &
Guar. Co., 373 F. Supp. 235, 239 (D.S.C. 1974) (proposed
interpretation of contractual provision rejected because it
would give "language no meaning at all beyond redundancy").

Lesavoy also argues that under South Carolina law, a
claim for indemnification must, by definition, rely on

33

underlying liability to a third party. However, under South
Carolina law "parties may craft an indemnity clause to provide
for other forms of compensation, including one in which a first
party is liable to a second party for a loss or damage the
second party might incur." Laurens Emergency Med. Specialists,
PA v. M.S. Bailey & Sons Bankers, 584 S.E.2d 375, 377-378 (S.C.
2003).

Finally, Lesavoy argues that the Trust Agreements do
not allow for recovery of attorneys' fees. Even if "[a]s a
general rule, attorneys' fees are not recoverable unless
authorized by contract or statute," and even were this Court to
construe the words "full protection" in the Trust Agreements as
unambiguously excluding attorneys' fees, South Carolina courts
recognize that defendants are entitled to recovery of fees where
the actions of a plaintiff in bringing suit "amounted to a
wrongful breach of a contractual obligation" and the fees were
incurred as a direct result of the breach. Hegler v. Gulf Ins.
Co., 243 S.E.2d 443, 444 (S.C. 1978). See also Addy v. Bolton,
183 S.E.2d 708, 710 (S.C. 1971) ("[I]n actions of indemnity,
brought where the duty to indemnify is either implied by law or
arises under contract, and no personal fault of the indemnitee
has joined in causing the injury, reasonable attorneys' fees
incurred in resisting the claim indemnified against may be

recovered as part of the damages and expenses."). By suing
Defendants, Lesavoy breached Article V of the Trust Agreements.

The Trust Agreements were part of the basis of
Defendants' acceptance of the Trusts' accounts from Comart.
Because Lesavoy's claims arise from Defendants' execution of
trades in the Trusts' accounts in accordance with the Trusts'
Managers' directions, Defendants are entitled to indemnification
for costs incurred in defending this lawsuit.

## Conclusion

The Defendants' motion for summary judgment dismissing
the remaining cause of action in the complaint and on their
counterclaim for indemnity is granted. Lesavoy's motion for
summary judgment dismissing the Defendants' counterclaim for
indemnity is denied.

Submit judgment on notice.

It is so ordered.

**New York, N.Y.**
**July  9 , 2008**

**ROBERT W. SWEET**
**U.S.D.J.**

35